IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIO ANTONIO BAUTISTA,<br><br>    Petitioner,<br><br>v.<br><br>J. TIM OCHOA,<br><br>    Respondent. | No. C 08-4646 MMC (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |

    Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Mario Bautista, who proceeds pro se and challenges the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse.[1]

## I. PROCEDURAL HISTORY

    In 2005, in Santa Clara County Superior Court, petitioner was convicted of sexual penetration of a person under the age of 16 (Cal. Pen. Code § 289(i))[2] as alleged in Count 1 of the Information; penetration of a person unconscious of the nature of the act (Pen. Code §

---

[1] Petitioner initially brought this action against John F. Salazar, the former warden of Chuckawalla Valley State Prison, where petitioner is incarcerated. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, J. Tim Ochoa, the current warden of Chuckawalla Valley State Prison, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] Except as otherwise specified, all statutory references herein are to the California Penal Code.

289(d)(4)) as alleged in Count 2; sexual penetration of a person under the age of 18 (Pen. Code § 289(h)) as alleged in Count 3; lewd or lascivious act on a person age 14 or 15 (Pen. Code § 288(c)(1)) as alleged in Count 5; and two counts of attempting to dissuade a witness from reporting a crime (Pen. Code § 136.1(b)(1)) as alleged in Counts 6 and 7. (Ex. A at 592-95, 664-74.)[3]

On July 5, 2006, the trial court sentenced petitioner to a term of eleven years and four months in state prison. (Ex. A at 1150-52.)

On June 3, 2008, the California Court of Appeal affirmed the judgment in a published opinion. People v. Bautista, 163 Cal. App. 4th 762 (2008).

On September 17, 2008, the California Supreme Court denied petitioner's petition for review. (Pet. Exs. C-D.)

Petitioner did not pursue habeas relief in state court.

On October 7, 2008, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

> From approximately 2001 to 2004, [petitioner] was the pastor and leader of an independent Pentecostal church in San Jose. The church met three times a week for services and was funded by donations from the 40 to 50 person congregation. [Petitioner], a licensed immigration attorney, was not paid for his role as pastor.
>
> In his sermons, [petitioner] described himself "as a true son of God." [Petitioner] spoke of prophecy and said that God was speaking through him. He preached that if anyone went against him, they would be against God. Among other things, [petitioner] guided the congregation on the appropriate way to raise children in the church. He was very strict about the separation of boys and girls and required a chaperone for coed groups. Dating was frowned upon, and [petitioner] stressed the prevention of teenage pregnancy. The church also emphasized keeping children away from gangs and drugs and it organized social events to keep the younger members of the church out of trouble.
>
> *A. Counts 2 and 5: Sexual Penetration (Roxana) and Lewd and Lascivious Act (Anna)*

---

[3] All references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

On July 24, 2004, [petitioner] led the regular Saturday service for the church. His sermon was about his recent trip to England and his shock at so many women revealing their bellies of "different colors, different shapes, different sizes."

Sixteen-year-old Roxana and her family were at the service. Roxana had been a member of the church for at least three years, and her family had attended for five years. Roxana trusted and respected [petitioner]. At the end of the service, Roxana told [petitioner], in response to his questioning, that she was upset because she had "done something with a guy." As the congregation was leaving, [petitioner] asked Roxana and two other teenage churchgoers, Anna and Y., to join him at the back of the church.

Roxana entered a back room of the church with [petitioner], leaving the other two girls outside the room. In the room, [petitioner] put his arms around Roxana just below her waist. The two stood close together with [petitioner's] pelvic region touching Roxana's, and Roxana could feel [petitioner's] penis.

Roxana and [petitioner] resumed their discussion of Roxana's actions with a boy. Roxana told [petitioner] she had touched a boy's penis and that the boy had put his fingers in her vagina. [Petitioner] then put his hand against Roxana's vagina, over her clothes. He asked her if she was still a virgin. She told [petitioner] she had not had sexual relations with the boy and, upon [petitioner's] continued questioning, confirmed that she was "sure" that she had not. Roxana was a "little mad in the inside" and did not want [petitioner] touching her, but did not tell him that. She was crying. Roxana tried to move [petitioner's] hand, but he told her not to be scared. [Petitioner] put his hand under her clothes and his fingers inside her vagina. It hurt a little bit, and Roxana told [petitioner] she did not like it. [Petitioner] said he wanted to determine if she was still a virgin. He then told Roxana she was no longer a virgin, took his fingers out, and hugged her. He told her he would not tell her parents anything about the boy and that they were not "going to tell nobody about anything." [Petitioner] asked Roxana to kiss him on the cheek and then gave her a kiss on the mouth, making her uncomfortable.

After Roxana exited the back room, 14-year-old Y. entered.[4] Anna testified that Roxana was sobbing as she exited the room. Anna, who was Roxana's friend, asked Roxana what was wrong. Roxana told Anna that [petitioner] had touched her "'down there,'" indicating her vagina, and that he had put his finger inside her.

A few minutes later, Y. exited the room and 15-year-old Anna entered. Like Roxana's family, Anna's family had attended the church three times a week since 2002. Anna trusted [petitioner]; he was important to her family and her parents went to him for guidance. [Petitioner] was sitting down in the room, and Anna stood a couple of feet away from him. [Petitioner] pulled Anna toward him and put his hands on her waist as she stood between his legs. He made small talk and then pulled her shirt up, stating that he wanted to see what kind of belly she had after seeing a lot of bellies in Europe. He then pulled the waistband of her skirt and looked down her skirt. He put his forehead on hers and pulled her close with his hands on her buttocks. She was uncomfortable

---

[4] Y. testified that [petitioner] spoke only of her studies, and that he did not hug her.

3

and hoped he would not touch her as he had Roxana. [Petitioner] placed his hands on Anna's head and, just before ending the conversation, kissed her. At a church event the next day, Anna told Roxana what had happened with [petitioner].

Around midnight a week later, July 31, 2004, Roxana's mother (D.) found Roxana and a girlfriend on the street in front of the house. D. was angry with Roxana and pushed her back into their house. D. said she was going to tell "Brother Mario because we used to tell [him] everything because they respected him and they feared him."[5] Roxana then told her mother about the July 24 incident. Roxana said that "[petitioner] had kissed her on the mouth and that he wanted to know if she was virgin, and he touched her to see if she was a virgin." Roxana also told her mother that [petitioner] "was always hugging her in a morbid way" and described past incidents. Roxana "was bothered and she was crying." Roxana said she had not spoken of this earlier because the family loved [petitioner] so much.

That same morning, July 31, D. called Anna's father (Jose) to tell him about the incident the week before. In response to Jose's resulting query, Anna said that [petitioner] had tried to kiss her on the mouth and grabbed her buttocks. She seemed ashamed and hurt, and she was crying. Anna told her mother that [petitioner] "had touched her" the previous Saturday. Jose called [petitioner] and spoke to [petitioner]'s wife about the girls' statements. [Petitioner] got on the phone when he heard that Roxanna's parents planned to call the police. He yelled at Jose and said he was going to kill himself.

Later that day, during the initial part of her interview with the police, Anna denied any touching because her family "had decided it might be wrong to push charges against [petitioner]." Likewise, when Jose first spoke to the police, he did not mention the touching as he was afraid to accuse his spiritual leader, "God's person."

*B. Counts 6 and 7: Dissuading a Victim or Witness (D. and Roxana)*

After the girls' families spoke on July 31, Roxana's father called the police. [Petitioner] then called Roxana's house. [Petitioner] did not deny the allegations but tried to convince D. to stop her husband from talking to the police; he suggested the family tell the police the allegation was made in anger and was a lie. During the phone call, D. heard people at [petitioner]'s house screaming and saying [petitioner] was going to kill himself.

[Petitioner] also spoke to Roxana on the telephone. He asked her if she wanted him to go to jail and wanted to destroy the church and his family. [Petitioner] told Roxana not to tell the police what happened and to say that she made it up because she was mad.

*C. Count 1: Sexual Penetration (Roxana)*

July 24 was not Roxana's first incident with [petitioner]. When she was 14 years old, her father dropped her off at [petitioner]'s law office for a church outing. Alone in his private office, [petitioner] asked Roxana if she was still a

---

[5] D. explained that, prior to July 2004, she respected, trusted, and loved [petitioner] and thought Roxana felt the same way. D. taught her children to do what [petitioner] told them.

4

virgin. She told him that she was. When [petitioner] said he was going to check, Roxana allowed it because she wanted him to know that she was a virgin. She did not know exactly what [petitioner] intended to do, but thought that it was appropriate for a pastor to confirm she was a virgin. [Petitioner] then reached his hand up her skirt and put his fingers in her vagina, as he did on July 24. He confirmed she was a virgin and told her to keep it that way. She did not report it at the time because she "didn't think it was anything bad."

[Petitioner], by hugging Roxana, also made her uncomfortable on other occasions. He would place his hands near her buttocks and hold her so that she could feel his penis.

*D. Count 4: Lewd or Lascivious Act (Anna)*

Anna also testified that July 24 was not the first time that [petitioner] had touched her inappropriately. In February or March of 2004, when Anna was 15 years old, she volunteered at [petitioner's] law office. One day, alone in his office, he pulled her close to him so that her legs were touching his and his hands were around her waist. The way he was holding her made her uncomfortable. Because of [petitioner's] position in the church, Anna did not think at the time that he had bad intentions and thought that she must be "making a big deal about it" in her own mind. On another occasion, at a broadcasting studio, he again pulled her close to him. He asked if she felt dirty, telling her that God had revealed to him that she felt dirty.

The jury found [petitioner] not guilty on this count.

*E. Prior Conduct*

Angelina T. met with [petitioner] in 1996 regarding an immigration problem. She was alone with him in his law office and he asked her increasingly personal questions, including about marital problems and her sexual practices with her husband. He told her to come close to him and said she would feel better if she cried. He grabbed her hands and sat her down on his lap with his arms around her waist. He then pulled her close and kissed her. She tried to push his shoulder to get away. She did not see [petitioner] after that evening meeting, but he called her and told her not to tell her husband. He said that, if she told anyone, then he would take her to court and it would be his word against hers. Angelina reported the incident to the police. [Petitioner] told the police that she may have made the accusations for money or to show her husband she could attract other men.

F.C. hired [petitioner] as an immigration attorney in 1998. [Petitioner] was friendlier to her after her husband's arrest and deportation in 1999. At one meeting, [petitioner] grabbed her hands. At another, he walked around the desk and grabbed her shoulders as she was crying. At a third meeting, [petitioner] would not let her companion come into the office with her. He locked the door, grabbed her shoulders, and said he liked her a lot. [Petitioner] pushed her to the floor and wanted her to perform oral sex. [Petitioner] unzipped his pants and pushed her head toward his erect penis, but she cried and told him to let her go. [Petitioner] let her go and F. never returned to the office. She thought that if she reported [petitioner], he would hurt her immigration case.

Maria S. sought [petitioner's] counsel as an immigration attorney in 2003. He hugged Maria during two of their meetings, making her uncomfortable. On a

5

third occasion, as he hugged her, his penis was hard and he asked her if she could feel the chemistry between them. Maria did not say anything because she had already paid him and she did not think anyone would believe her.

Additionally, a nurse, certified as an expert, testified that one could not verify a girl's virginity by placing one's fingers inside her vagina. An investigator from the district attorney's office also testified regarding child abuse accommodation syndrome.

*F. Defense*

[Petitioner] testified on his own behalf. He described the formation of the church and his role as pastor. The church began as a Bible study in his house and when the group got too large, he was asked to start a church. The congregation rented a building, and [petitioner] founded the church and incorporated it as a nonprofit organization.

[Petitioner] did not have formal training to be a pastor, but he attended "many seminars and courses and studies." His training amounted to "[h]undreds of hours," and included some Jesuit school training at a university in El Salvador. [Petitioner] did not mention holding any certificate or license to act as a pastor.

As pastor, [petitioner] counseled both children and adults. The church was especially concerned with protecting children from drugs, gangs, and teenage pregnancy. Children in the church would confide in him, and sometimes he would relay the information to their parents for their well-being.

[Petitioner] testified that Roxana approached him to talk on July 24, 2004. In the back room, Roxana cried and described her sexual conduct with a boy. He asked her if she had had sexual intercourse and if she was still a virgin. She said she was a virgin, but he told her that she should tell her mother about her conduct. If she did not, he would talk to her mother. They prayed together, and Roxana left the room. [Petitioner] denied any inappropriate touching.

The same day, [petitioner] spoke with Anna about her home life. Anna told him that Roxana's brother, Daniel, had been sending her emails. Earlier in the trial, Anna and her parents had explained that at one time [petitioner] had advised Anna's parents that Anna should be kept away from Daniel. [Petitioner] said that Daniel was a bad influence on Anna. Anna's parents listened to [petitioner] and told Anna she could not see Daniel outside of church. Anna knew that this was [petitioner's] recommendation. Anna's parents also restricted her access to Roxana. Thus, during the conversation on July 24, [petitioner] told Anna she should tell her parents about the emails from Daniel. The next day, [petitioner] told Anna's father about the emails. [Petitioner] denied any inappropriate touching during his conversation with Anna.

On July 31, 2004, [petitioner] spoke with Roxana and told her to stop her accusations because they were untrue. However, [petitioner] denied ever telling anyone not to call the police and said he was under the impression the police already had been called at the time he talked to the girls' parents. He denied any physical contact with Angelina, other than a handshake; denied pressing his penis against Maria; and denied touching F. inappropriately.

[Petitioner's] wife said she saw the three girls go to the back of the church with [petitioner] on July 24 and that she saw nothing unusual. The girls were

6

laughing and talking, and Roxana was not crying.

[Petitioner's] wife reiterated that [petitioner] recommended to Anna's parents that Anna and Daniel not be alone together. She explained that [petitioner] told Anna's parents on July 25 that Daniel was emailing Anna. Other members of the church corroborated the email discussion. One 15-year-old member of the church, Leonardo P., testified that Anna told him at a church retreat that she hated [petitioner] because he had "squashed" her relationship with Daniel.[6]

Both [petitioner's] wife and a fellow church member, who was at [petitioner's] house on July 31, denied that [petitioner] ever mentioned killing himself. Several employees from [petitioner's] law office, including his wife, testified that Roxana was not wearing a skirt when she was dropped off at [petitioner's] office for a church camping trip in 2002.

A pastor from El Salvador, who had known [petitioner] since 1976, also testified on [petitioner's] behalf. He visited [petitioner] in August 2004 and asked Anna what [petitioner] did to her. Anna said nothing had happened and that she was supporting her friend, Roxana. Anna's mother told the pastor the charges would be dropped.

People v. Bautista, 163 Cal. App. 4th 762, 766-72 (2008) (footnotes renumbered).

## III. DISCUSSION

A. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious

---

[6] During Anna's testimony, she had denied being angry with [petitioner] and denied ever stating that she hated him.

7

effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

In the present case, the only state court to address the merits of petitioner's claims is the California Court of Appeal on direct review. People v. Bautista, 163 Cal. App. 4th 762 (2008). The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.  Petitioner's Claims

Petitioner claims his conviction and sentence are invalid because: (1) the rape charge

8

1 was supported by insufficient evidence of the victim's "unconsciousness" as defined by
2 Penal Code section 289(d)(4), (2) the trial court erroneously excluded evidence of the
3 victim's prior sexual conduct, (3) the trial court erroneously admitted evidence that
4 mischaracterized and ridiculed petitioner's religious beliefs, (4) the trial was rendered
5 fundamentally unfair as the result of cumulative error, (5) the aggravating factors used to
6 support imposition of a consecutive sentence were found by the trial judge instead of by a
7 jury, and (6) the requirement that petitioner register as a sex offender cannot be upheld
8 because of the unlawful rape conviction. The Court addresses each claim in turn.

    1. <u>Insufficient Evidence</u>

Petitioner claims there is insufficient evidence to support his conviction under Penal Code section 289(d)(4) (Count 2), for sexual penetration of a person unconscious of the nature of the act. Penal Code section 289(d)(4) provides in relevant part:

> Any person who commits an act of sexual penetration, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act or causing the act to be committed, shall be punished by imprisonment in the state prison for three, six, or eight years. As used in this subdivision, "unconscious of the nature of the act" means incapable of resisting because the victim . . . [¶](4) [w]as not aware, knowing, perceiving, or cognizant of the essential characteristics of the act *due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose.*

Cal. Pen. Code § 289(d)(4) (emphasis added).

Petitioner contends there was insufficient evidence of "fraudulent representation that the sexual penetration served a professional purpose" because: (1) he was an unlicensed and unpaid pastor, and (2) his victim (Roxana) was aware of his true intentions. (Pet. Ex. C at 5-21.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, <u>Jackson v. Virginia</u>, 443 U.S. 307, 321 (1979), which,

9

1 if proven, entitles him to federal habeas relief, id. at 324.  For purposes of determining such
2 claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable
3 to the prosecution, any rational trier of fact could have found the essential elements of the
4 crime beyond a reasonable doubt." Id. at 319 (emphasis in original).  Where the record
5 supports conflicting inferences, a federal habeas court must presume the trier of fact resolved
6 any such conflicts in favor of the prosecution, and must defer to that resolution.  Id. at 326.
7 Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt,
8 may the writ be granted.  Id. at 324.

9       Petitioner's first argument, that his conduct did not fall within the provisions of
10 section 289(d)(4) because he was an unlicensed, unpaid pastor, fails because it rests entirely
11 on an interpretation of state law.  The Court of Appeal exhaustively analyzed this claim in a
12 published opinion.  Bautista, 163 Cal. App. 4th at 773-78.  Therein, the appellate court
13 concluded the statute "does not mandate that the perpetrator be a 'professional'" or that the
14 perpetrator "meet formal certification or licensing requirements." Id. at 774.  The appellate
15 court found "no basis on which to exempt members of the clergy from those that may purport
16 to have a 'professional purpose.'" Id. at 775.

17       In sum, petitioner's first argument has been conclusively resolved against petitioner
18 by the California courts.  This Court must defer to the State of California's interpretation of
19 its own laws.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding federal writ not
20 available for alleged error in interpretation or application of state law); Aponte v. Gomez,
21 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's
22 construction of its own penal statutes").

23       Petitioner's second argument, that Roxana was not "unconscious" of the nature of his
24 actions because she was aware of his true intentions, also fails.  As found by the Court of
25 Appeal, petitioner was a significant authority figure to Roxana.  Specifically, he was the
26 leader of Roxana's church and its sole pastor.  (Ex. B at 684-86.)  Petitioner held himself out
27 as the voice of God and a true son of God.  (Id. at 629, 633, 686.)  In his sermons, he spoke
28 about how young people "should pay attention to him" and he told them to obey him.  (Id. at

10

686.) Roxana's mother taught her to do as petitioner told her. (Id. at 630.) Roxana respected and trusted petitioner. (Id. at 687-88.) Petitioner met with Roxana in his capacity as church leader, immediately following the July 24, 2004 service, over which he presided. (Id. at 689-92.) One of the chief tenets of petitioner's church was to protect the chastity of its teenage members (id. at 320, 379-80, 430), and petitioner told Roxana he wanted to determine whether she was still a virgin (id. at 700). Roxana testified she thought petitioner touched her only to confirm her virginity and that she thought this action was appropriate due to his role in the church. (Id. at 706-07.)[7] She testified it was not until he kissed her on the mouth, after removing his finger from her vagina, that she questioned his intentions. (Id. at 707-08.)

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find Roxana was misled into believing petitioner had a professional reason for touching her as he did.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2. Exclusion of Evidence

Petitioner claims the trial court erred in excluding evidence of Anna's prior sexual conduct. (Pet. Ex. C at 22-28.) The Court of Appeal summarized the issue and ruled as follows:

> A defendant generally cannot question a sexual assault victim about his or her prior sexual activity. (*People v. Woodward* (2004) 116 Cal.App.4th 821, 831, 10 Cal.Rptr.3d 779.) However, a limited exception is applicable if the victim's prior sexual history is relevant to the victim's credibility. (Evid.Code, § 1103, subd. (c)(4); *People v. Chandler* (1997) 56 Cal.App.4th 703, 707, 65 Cal.Rptr.2d 687 (*Chandler*).) In prosecutions brought pursuant to section 288, Evidence Code section 782 provides for a strict procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. (*Chandler*, at p. 708, 65 Cal.Rptr.2d 687; *People v. Daggett* (1990) 225 Cal.App.3d 751, 757, 275 Cal.Rptr. 287 (*Daggett*).) Evidence Code section 782 is designed to protect victims of molestation from "embarrassing personal disclosures" unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 447, 271 Cal.Rptr. 653.) If, after review, "the court finds the evidence relevant and not

---

[7] Similarly, in describing the incident that occurred when she was 14 years old, Roxana testified she had allowed petitioner to touch her because she thought it appropriate for a pastor to confirm her virginity. (Id. at 734.)

11

inadmissible pursuant to Evidence Code section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted." (*Daggett*, at p. 757, 275 Cal.Rptr. 287.) "A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." (*Chandler*, at p. 711, 65 Cal.Rptr.2d 687.)

In this case, defense counsel presented testimony, outside the presence of the jury, about a meeting in February 2004 in which [petitioner] talked to Anna's parents about Anna's relationship with Daniel. Anna's parents were told that Anna and Daniel had had sexual relations and that they should take Anna to the doctor to make sure she did not have a venereal disease. [Petitioner's] statements were prompted by an incident the night before. Anna and several other teenagers had spent the night together, and witnesses saw Anna and Daniel kissing under a blanket. Anna admitted that she had given Daniel hickeys that night and that they spent a portion of the evening together under the blanket, but denied sexual intercourse. Based on this incident, [petitioner] advised Anna's parents that Anna and Daniel, and even Anna and Roxana, be kept apart. Anna's parents followed [petitioner's] advice.

Defense counsel argued that the admission of Anna's and Daniel's actions that evening was the only way for the jury to evaluate whether the conduct involved was serious enough to cause Anna to falsely accuse [petitioner].[8] The trial court rejected this argument. It ruled that defense counsel could cross-examine Anna regarding the incident in which she was told, at [petitioner's] direction, that she must end her relationships with Daniel and Roxana. However, the court excluded "any questions that go into whether there was a hickey or under the blanket or anything like that." The trial court found that, although Anna's alleged hatred of [petitioner] and [petitioner's] interference in her relationships were relevant facts, the "sexual aspect" of the incident was not "probative at all."

We agree with the trial court. Contrary to [petitioner's] claim that absent the sexual conduct he was unable to elicit "the source of Anna's resentment" toward [petitioner], he had ample opportunity to explain Anna's motive and bias. During the trial, several witnesses testified regarding [petitioner's] interference in Anna's relationship with Daniel and her friendship with Roxana. The jury heard more than once that Anna knew [petitioner] had advised her parents to keep her away from Daniel and Roxana, and Leonardo testified that Anna hated [petitioner] because of this interference. It is the repercussions of the sexual conduct with Daniel, and not the conduct itself, which ultimately are relevant to understanding Anna's alleged bias against [petitioner].

. . . The details of the relationship between Daniel and Anna are at best tangentially related to Anna's feelings toward [petitioner] and to any bias or motive to lie.

Bautista, 163 Cal.App.4th at 781-83 (footnote renumbered).

"State and federal rulemakers have broad latitude under the Constitution to establish

---

[8] Prior to the trial court's ruling, defense counsel conceded that the issue of a venereal disease had little relevance in the case: "I see that as a side issue not a part of the motive."

12

rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal quotation and citation omitted); see Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding due process does not guarantee defendant right to present all relevant evidence). Such latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See Holmes, 547 U.S. at 324.

In deciding whether the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)). The court also must give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. See Chia, 360 F.3d at 1006; Miller, 757 F.2d at 995. Here, under the applicable Miller factors, the exclusion of the details of Anna's sexual conduct did not violate petitioner's due process rights.

With respect to the first factor, probative value, evidence that Anna gave her boyfriend a hickey was not in any manner probative on the point for which petitioner wanted to introduce such evidence. The basis of petitioner's motion to admit the evidence of prior sexual conduct was not that the evidence would be used, for example, to prove consent or Anna's sexual character, but rather that it would show Anna harbored a hatred toward petitioner, giving her a motive to fabricate her allegations. (See Ex. B at 267-69.) Anna's alleged motive to lie stemmed from the fact that petitioner had tried to prevent her from seeing her boyfriend, not from the fact that Anna had given her boyfriend a hickey or spent time with him under a blanket. It was petitioner's conduct, not Anna's that formed the alleged motive to lie.

The second and third Miller factors, the reliability of the evidence and whether it was capable of evaluation by the trier of fact, arguably weigh in favor of admissibility because

13

Anna admitted she had given her boyfriend a hickey and that they had spent part of the evening under a blanket. These factors, however, are heavily outweighed by the other three factors.

The fourth Miller factor, whether the detail was the sole evidence on the point petitioner wanted to show, weighs against admissibility. As discussed, petitioner sought to introduce the evidence to show Anna's alleged motive to lie. As found by the Court of Appeal, the fact that Anna gave her boyfriend a hickey and/or spent time with him under a blanket was, at best, only tangentially related to such issue. Moreover, petitioner was able to introduce ample other evidence on this point. Specifically, Anna acknowledged during cross-examination that, based on petitioner's advice, her parents did not want her to see Roxana or Daniel. (Ex. B at 497.) Petitioner's wife testified petitioner had told Anna's parents that Anna and Daniel should not be left alone together and that, on another occasion, petitioner had told them Anna and Daniel were communicating on the internet. (Id. at 1212, 1216.) Leonardo Paz, a member of petitioner's church, testified that at a church retreat, Anna told him she hated petitioner because he "squashed" her relationship with Daniel. (Id. at 1100-02.) In sum, the hickey/blanket details by no means constituted the sole evidence as to the issue of Anna's purported motive to lie.

Not surprisingly, with respect to the fifth factor, the excluded evidence was not a major part of petitioner's defense. The major part of petitioner's defense on the charges involving Anna was her purported motive to lie. As discussed, petitioner elicited extensive evidence on this point.

Petitioner's claim that the exclusion of evidence limited his cross-examination of Anna, in purported violation of his Sixth Amendment right to confrontation, also fails. The Confrontation Clause of the Sixth Amendment does not prevent a trial judge from imposing reasonable limits on cross-examination, based on concerns as to harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is

14

effective in whatever way, and to whatever extent, the defense might wish." See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis omitted). Trial judges thus possess "wide latitude" to impose reasonable limits on cross-examination of witnesses. See Van Arsdall, 475 U.S. at 679.

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion of evidence on cross-examination, a court must inquire whether: "(1) the excluded evidence was relevant; (2) there were other legitimate interests outweighing the defendant's interests in presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness." United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted). A defendant meets his burden of showing a Confrontation Clause violation by showing "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility . . . had [] counsel been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).

For the reasons discussed above, the trial court's ruling precluding petitioner from cross-examining Anna on the details of her conduct with her boyfriend was both reasonable and non-prejudicial. First, whether Anna gave her boyfriend a hickey and/or spent some time with him under a blanket had little to no probative value as to her purported motive to lie. Second, it was reasonable for the trial court to exclude the evidence out of a concern that the witness not be subjected to unnecessary embarrassment. Finally, the record shows the trial court allowed the defense to introduce substantial evidence of Anna's purported hatred of petitioner and her alleged motive to lie. A reasonable jury would not have had a significantly different impression of the victim's credibility if counsel had been allowed to question her about her conduct with her boyfriend. See Van Arsdall, 475 U.S. at 680.

Accordingly, petitioner is not entitled to habeas relief on this claim.

3. First Amendment Claim

Petitioner claims his First Amendment rights were violated when the trial court

1 allowed introduction of evidence of his religious beliefs. (Pet. Ex. C at 28-30.) The Court of
2 Appeal summarized the issue as follows:

> Prior to trial, defense counsel moved in limine to preclude questioning regarding the religious beliefs or practices of [petitioner] or any witness. The trial court stated that it would not permit the prosecutor to criticize or denigrate the beliefs of [petitioner] or any witness. The court found, however, that, due to [petitioner's] position in the church, the presence of strict doctrine regarding the behavior of young churchgoers, the nature of the charges, and the behavior of the victims, some discussion of religious beliefs would be appropriate. As set forth in the recitation of facts, the background of the church and the religious tenets of its members were discussed at various points during the trial. [Petitioner] claims that the admission of this testimony regarding his religious beliefs deprived him of his First Amendment rights.

Bautista, 163 Cal. App. 4th at 784.

A state court's admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Even if the admission was improper under state rules of evidence, a habeas petitioner is only entitled to relief if the admission of evidence was arbitrary or prejudicial to such an extent that his trial was rendered so fundamentally unfair as to violate his constitutional rights. Butcher v. Marquez, 758 F.2d 373, 378 (9th Cir. 1985). Due process is violated only if there are "no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). "[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." Dawson v. Delaware, 503 U.S. 159, 165 (1992).

The admission of evidence of petitioner's religious beliefs did not render petitioner's trial so fundamentally unfair as to violate his due process rights. The Supreme Court has permitted the admission of evidence of a defendant's beliefs and associations when used to establish something other than the character of the defendant. See United States v. Abel, 469 U.S. 45, 54 (1984). In Abel, the Supreme Court held the prosecution could impeach a defense witness with evidence that the witness and defendant were both members of the Aryan Brotherhood, and, as such, were sworn to lie for each other. Abel, 469 U.S. at 54-55.

16

1 In so holding, the Supreme Court stated: "Whatever First Amendment associational rights an
2 inmate may have to join a prison group, those rights were not implicated by [introduction of
3 such evidence]." Id. at 53 n.2 (internal citation omitted).

4     Here, the case centered on petitioner's role as pastor of his church. As discussed
5 above, the victims were teenage members of the church. Petitioner committed the July 24
6 offenses in a church office, under the guise of his official role as pastor. One of the
7 purported tenets of the church was protection of its teenage members' chastity. As noted by
8 the Court of Appeal, "[t]he testimony regarding the churchgoers' beliefs was relevant to
9 understanding the meetings with [petitioner], [petitioner's] actions, the girls' initial
10 acceptance of [petitioner's] behavior, and the families' subsequent reactions." Bautista, 163
11 Cal. App. 4th at 784. Because the jury could have drawn the "permissible inference," see
12 Jammal, 926 F.2d at 920, that the evidence of plaintiff's religious beliefs established
13 petitioner's method of misleading his victims, his constitutional rights were not violated.

14     Accordingly, petitioner is not entitled to habeas relief on this claim.

15     4.   Cumulative Error

16     Petitioner claims the cumulative effect of the foregoing asserted trial errors was
17 prejudicial. (Pet. Ex. C at 31.) As discussed above, the Court has found no constitutional
18 error exists, let alone multiple errors. As there have been no errors to accumulate, there can
19 be no due process violation based on a theory of "cumulative" error. See Mancuso v.
20 Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (holding, where there is no error, there can be no
21 cumulative error).

22     Accordingly, petitioner is not entitled to habeas relief on this claim.

23     5.   Sentencing Error

24     Citing Apprendi v. New Jersey, 530 U.S. 466 (2003), and its progeny, Blakely v.
25 Washington, 542 U.S. 296 (2004) and Cunningham v. California, 549 U.S. 270 (2007),
26 petitioner claims the trial court's imposition of consecutive terms without a specific finding
27 by the jury violated his Sixth Amendment rights. (Pet. Ex. C at 31-34.) In Apprendi, the
28 Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases

17

the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

Petitioner's reliance on such authority is unavailing. Apprendi and the above-referenced related cases, Blakely and Cunningham, do not apply to a trial court's decision as to whether to impose concurrent or consecutive sentences. See Oregon v. Ice, 555 U.S. 160, 161-64 (2009). Rather, those cases impose constitutional limits on a trial court's ability to increase the statutory maximum sentence for a single conviction, and do not address the manner in which sentences for convictions on separate charges may be imposed. Id. at 163-64, 172 (holding Sixth Amendment does not preclude states from allowing judges to determine facts bearing on decision to impose consecutive rather than concurrent sentences).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 6. Sex Offender Registration

Petitioner claims the requirement that he register as a sex offender cannot stand because his conviction on Count 2, sexual penetration of a person unconscious of the nature of the act, was unconstitutional. (Pet. E. C at 34-35.) As discussed above, petitioner's conviction on Count 2 was not in violation of his constitutional rights.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

## C.   Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

18

Here, petitioner has not made such a showing and, accordingly, a certificate of appealability will be denied.

### IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden J. Tim Ochoa on the docket as the respondent in this action.

IT IS SO ORDERED.

DATED: February 23, 2012

MAXINE M. CHESNEY
United States District Judge